ELMER H. WENE, PETITIONER-APPELLANT, v. ROBERT B. MEYNER, DEFENDANT-RESPONDENT.

Argued June 25, 1953—Decided July 9, 1953.

188

Mr. *Robert C. Gruhin* argued the cause for appellant (*Mr. Francis M. McInerney*, attorney).

Mr. *Milton B. Conford* argued the cause for respondent (*Messrs. Joseph Weintraub* and *Gerald T. Foley* on the brief).

The opinion of the court was delivered by

HEHER, J.   We have here a proceeding under *R. S.* 19:29–1 *et seq.*, as amended by *L.* 1947, *c.* 6, *p.* 21, instituted by an unsuccessful candidate against the successful candidate for the gubernatorial nomination of the Democratic Party at the primary election held April 21, 1953.

Robert B. Meyner was declared the party's nominee for Governor by a state-wide plurality of 1506 votes over the contestant, Elmer H. Wene.   In Warren County Mr. Meyner's total vote was 7,820, and Mr. Wene's 360; and in Hudson County the former received 58,883 votes, and the latter 28,908 votes.   The petition invoking the statutory jurisdiction declares that in Warren and Hudson counties electors were allowed to vote in the Democratic primary "who had not voted for (*sic*) two subsequent annual primary elections," and "had not signed but were required to sign a declaration designating the political party in whose Primary Election they desired to vote": in Warren County some 2,000 in number, and in Hudson County 1,000 or more according to incomplete information then in hand, more than "sufficient to change the result of the election."   There was attached to the petition a schedule naming 3,200 voters whom the contestant allegedly had "been able to presently ascertain as not having first signed a declaration as required by law"; and it was asserted that if a hearing were had the names

of other such voters "will be readily available." The prayer was for judgment declaring "illegal" and setting aside all votes cast in the Democratic primary "by persons who had so failed to vote in two subsequent annual primary elections and had failed to sign the necessary declaration as required by law," to the end that the contestant be declared the "winner of the Primary Election"; and a hearing was asked to determine the "exact number" of voters in the asserted illegal category.

The defendant nominee interposed a motion for a summary judgment on the ground that there was no genuine issue of fact, and the alleged statutory "violation, if any, does not affect the legality of the votes cast or the legality of the election." The motion was supported by affidavits, unchallenged by countervailing proof, tending to show a contrariety of view among election officers throughout the State as to the need under the statute for "any separate form of declaration" in circumstances such as we have here, and, at all events, a general disregard of the strict letter of the regulation in some of the counties, as serving "no practical purpose"; in some, a failure to return the signed declarations; and in Warren County, an insufficient supply of forms. Defendant reserved the right to "advance the same challenges" made by the contestant as to "the other counties," should "their legal sufficiency be sustained." Judge Joseph L. Smith granted the motion, after argument; and there was judgment accordingly for the nominee and against the contestant. The contestant's appeal to the Appellate Division of the Superior Court was by this court certified for decision at the instance of the nominee, on June 18, 1953.

The contention is that all such votes were cast in violation of *R. S.* 19:23–45, as amended by *L.* 1952, *c.* 158, *p.* 526, and "should not have been counted or certified in the official primary election tabulation."

The pertinent provisions of this act are: (a) a voter who votes in a primary election of a political party shall be deemed to be "a member of that party until two subsequent annual primary elections have elapsed after casting of such

party primary vote"; and (b) a voter "who has not voted in a primary election of a political party for two subsequent annual primary elections" shall not be permitted to vote "in any primary election of a political party" until he has "first signed and filed with the district board a declaration designating the political party in whose primary election he desires to vote."

It was conceded on the oral argument that none of the voters to whom this challenge is directed were wanting in the basic as distinguished from the procedural qualifications for participation in the Democratic primary. None were within the interdict of the statute that an elector who votes in a primary election of a political party shall be deemed to be a member of that party until two subsequent annual primary elections have been held, and therefore ineligible to cast a ballot in the primary of another political party. The insistence is that there must also be literal compliance with the companion provision of the statute that a voter who has not cast a ballot in a primary election of a political party for two subsequent annual primary elections shall not be allowed to vote in any primary election of a political party until he has made a signed declaration of the political party in whose primary he desires to vote. This is termed a peremptory statutory *sine qua non*, of the very essence of the right of primary participation, and thus the votes cast in disregard of the requirement are a nullity and of necessity to be excluded in determining the result.

The provision does not have such drastic sweep. Under the statute, party "membership" determines the right of primary participation; and a voter who casts a ballot in the primary election of a political party is deemed to be a member of that party until two subsequent annual primary elections have been held. He may change his party affiliation, but a formal signed declaration to that end is not of the real essence of the right. Unless it be expressed in clear and indubitable terms, a legislative requirement of a written declaration of the new allegiance is not so woven into the reality of the right as to void a ballot cast without that

formality. Such a declaration relates not to the substance, but rather the exercise of the right of franchise; and an irregularity or omission in the procedural function is not fatal, absent a change in the result of the election on the merits.

Primary elections are of public concern. They afford the means by which political parties choose their candidates for public office; and, since the purpose to be served is public in its nature, the proceedings attending the selection of candidates are subject to regulation in the exercise of the police power. It is the legislative province to limit the use of the selective process to those who have "practical affiliation" with the particular party and to repel interference from outsiders who are not bound by the common tie and do not share the common aim. *Hopper v. Stack*, 69 *N. J. L.* 562 (*Sup. Ct.* 1903); *State v. Bienstock*, 78 *N. J. L.* 256 (*Sup. Ct.* 1909). Genuine attachment to the party may be made a condition prerequisite to such participation in party affairs and function, for the protection of the party and its members in the fulfillment of a public service that is now generally deemed to attend the operation of the party system of political management. *Kilmurray v. Gilfert*, 10 *N. J.* 435 (1952). Thus, under our statute the right to take part in a primary depends upon party "membership," and the provisions under review are to be assessed in the context of a policy designed to provide the means to that end.

The political function of a political party and its members involves rights and interests which are subject to legislative regulation for their own protection. The Legislature may invoke measures reasonably appropriate to secure the integrity of the nominating process in the service of the community welfare. There is not in such course undue interference with the freedom and equality of elections or the constitutional right of suffrage. The same public interest is advanced in the regulation of the selective mechanism as in the protection of general elections. In fine, the Legislature may safeguard the right of individual voter-participa-

tion in the choice of party candidates, in the common interest of the party membership, its concepts and ideals, and thus for the general good and welfare; and the statutory provisions under review are to be judged by that principle.

number, and in Hudson County, 1,000 or more according to ▮ Although without constitutional sanction, political parties from the early days of the Republic represented differences of philosophy and thought in relation to governmental policy; and they are now regarded as a necessary adjunct to representative government. *Kilmurray v. Gilfert*, cited *supra; People ex rel. Lindstrand v. Emmerson*, 333 Ill. 606, 165 N. E. 217, 62 A. L. R. 912 (*Sup. Ct.* 1929). In seeking for the legislative policy of an act regulatory of primary elections, the basic province of the institution is to be kept in view, and restraints upon suffrage assayed as a means of preventing abuse of the political ideal of the party system. The primary is a substitute for the party convention, in an area identified with the essential public interest. *Vide State v. Woodruff*, 68 N. J. L. 89 (*Sup. Ct.* 1902).

▮ It would be a forced interpretation, at variance with the essential quality and meaning of the provision, to hold that even though the individual voter had, by the unimpeachable record, the undoubted right to take part in the primary of the particular party, the vote cast becomes void for failure of the election board to demand a formal written declaration of the voter's "desire" to take part in the primary of that party, and is to be charged against the successful candidate in the final count, even though the candidate for whom it was cast be unknown. A primary, after all, is a medium for expressing the preferences of those united under the party standard; and, while protective legislative measures are to be enforced according to their spirit, a construction that would nullify votes cast by qualified primary electors is to be avoided unless that purpose be expressed in clear and unambiguous terms. It would be a harsh and oppressive construction that would reject the votes cast here by electors of undoubted qualifications for want of a formal written declaration by the voter of his "desire" to participate in the

Democratic primary, even though that desire was unequivocally expressed by the action of voting itself.

The history is revealing as to the policy of the 1952 amendment of the statute. The evident purpose was to dispense with the preexisting requirement of an affidavit by the primary elector that he was a member of the particular party, and not identified with any other, and intended to vote for the nominees of that party at the next ensuing general election. Obviously, it was deemed impolitic to visit upon the voter, as a condition to primary participation, legal and moral compulsions upon the exercise of the right of franchise at variance with the dictates of conscience when the day of the general election arrived. It is to be borne in mind that party platforms are adopted at a convention held subsequent to the primary, composed in part of the party's nominees for office chosen at that election, and political policies are also formulated by the primary nominees in the course of the general election campaign, very often in relation to post-primary developments. The only conceivable purpose to be served by the substitute written declaration, vague as it is, would be the unequivocal manifestation of the elector's intention to participate in the primary of the particular political party, thereby evidencing his willful transgression of the law where the basic right of franchise did not exist; and, such being the case, we are clear there was not a legislative design to invalidate votes cast without such written declaration where, as here, the electors had the essential qualifications of a primary elector under the statutory standard.

The contestant suggests that while it was also intended by the amendment to lay upon the voter the duty to "reflect and consult his conscience," and thus to deter "invasion" of the "opposition Party's Primary," the "main purpose" of the written declaration was to enable the district board "to compare the voter's signature with his prior signature."

But the purpose of the supplanted provision was not to provide the means of identifying the primary elector by

signature comparison; and it is plainly not the aim of the substitute declaration. There is other provision in this regard.

*R. S.* 19:31–1 *et seq.*, as amended, provides for a permanent registration record of the individual voter. *N. J. S. A.* 19:31*A*–7 ordains that there shall be printed on the back of the "duplicate permanent registration and voting form" a "signature comparison record, which record shall have in the left-hand side one-half inch from the top, a line upon which the voter when registering shall place his signature," and "Directly underneath this line" shall be printed the words "sample signature"; the commissioner of registration is enjoined to obtain the signature of the registrant on the "original and duplicate registration forms" and also on the "signature comparison record on the back of the duplicate registration form above" the words "sample signature." *N. J. S. A.* 19:31*A*–8 directs that in addition to signing the signature comparison record, "and after the comparison of the signature with the signature in the register, a person offering to vote at a primary election for the general election shall announce his name and the party primary in which he wishes to vote," and, after the vote is cast, the member of the district board having charge of the signature copy registers shall place the number of the voter's ballot in the "proper column" on the record of his voting form, and in the appropriate column "the first three letters of the name of the political party whose primary ballot such person has voted."

*R. S.* 19:23–46 provides that the voter "offering to vote" shall "announce his name and the party primary in which he wishes to vote"; and the duty is laid upon the district board to "ascertain by reference to the signature copy register or the primary election registry book required" by the act, and, in municipalities not having permanent registration, "if necessary by reference to the primary party poll books of the preceding primary election," that such voter is "registered as required" by the act, "and also that he is not ineligible or otherwise disqualified by the provisions of

section 19:23–45" of the act, "in which event he shall be allowed to vote."

There is no question that there was compliance with these provisions as to all the primary electors who cast the votes now the subject of challenge. The district board's failure to exact the formal written declaration of the individual elector's "desire" to cast his vote in the primary for which he was concededly qualified under the law was a mere irregularity which did not constitute "malconduct, fraud or corruption" by the board members; nor did the omission render the votes "illegal" within the intendment of *R. S.* 19:29–1, enumerating the grounds of contest.

The determinative factor is not whether the taking of the formal written declaration is mandatory or directory. The legal consequences of the omission are a matter of legislative intention; and in such an inquiry labels and nomenclature are not decisive. Acts and omissions to act may render the local election officers liable to indictment, and yet, absent malconduct, fraud, or corruption, the election result is unimpeachable. *In re Clee*, 119 *N. J. L.* 310, 321 (*Sup. Ct.* 1938). Where, as here, there is an unwitting omission of a formal requirement otherwise supplied in substance, the ballots are invulnerable; the overturning of the result in such circumstances would frustrate the will of the voters for errors and omissions of form not related to the merits; and this would do violence to the legislative will. In this regard, acts and omissions by the district board mandatory before election may for reasons of policy be deemed directory after the election, if it indubitably appears that the election result was not thereby prejudiced. The question is essentially one of fairness in the election. An election is not vitiated by the defaults of election officers not involving malconduct or fraud, unless it be shown that thereby the free expression of the popular will in all human likelihood has been thwarted. Compare *Morritt v. Cohen*, 255 *App. Div.* 804, 7 *N. Y. S. 2d* 338, *Id.*, 279 *N. Y.* 617, 17 *N. E. 2d* 679 (*Ct. App.* 1938). There, it was held that the failure of 27 voters to sign the registry book, through the oversight of the

inspectors of election, would not be visited upon voters otherwise qualified by the withdrawal of 27 ballots, thus reducing the total of the ballots counted.

There is an affirmative indication of this policy in our own statute. Apart from the natural significance of the cited provisions, standing alone, it is also provided that where the evidence in a proceeding of this class reveals that "the offense complained of was not committed by the candidate, or with his knowledge or consent, and that all reasonable means were taken by or on behalf of the candidate to prevent the commission of any such offense, or that the offenses complained of were trivial or unimportant," or that any act or omission of the candidate complained of arose from "accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith," and it would "be unjust that the candidate shall forfeit his nomination, position or office," then the nomination or election of such candidate shall not by reason of such offense be void. *R. S.* 19:3–9.

A statute is not to be given an arbitrary construction, according to the strict letter, but rather one that will advance the sense and meaning fairly deducible from the context. The reason of the statute prevails over the literal sense of terms; the manifest policy is an implied limitation on the sense of the general terms, and a touchstone for the expansion of narrower terms. *Fischer v. Fischer,* 13 *N. J.* 162 (1953). As said by Mr. Chief Justice Vanderbilt in *Kilmurray v. Gilfert,* cited *supra* [10 *N. J.* 435, 91 *A. 2d* 867]:

"Election laws are to be liberally construed so as to effectuate their purpose, *Carson v. Scully,* 89 *N. J. L.* 458, 465 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 295 (*E. & A.* 1917). They should not be construed so as to deprive voters of their franchise or so as to render an election void for technical reasons, *In re Stoebling,* 16 *N. J. Misc.* 34 (*Cir. Ct.* 1938) ; *Sharrock v. Keansburg,* 15 *N. J. Super.* 11 (*App. Div.* 1951)."

The irregularities pleaded must be sufficient, if established by proof, to warrant the relief sought. Unless the allega-

tions of the pleading would, if proved, operate *per se* to disqualify the nominee, or were of a character such as would alter the result, the pleading is insufficient to sustain the proceeding as against a motion for a summary judgment of dismissal. This is the case here. There is no occasion for a factual inquiry; if the allegations of the petition were sustained by the proofs, the contestant would not be entitled to the relief prayed.

This is not to say that the statutory requirement may be ignored with impunity. A willful failure of duty by the election officers is indictable. *R. S.* 19:34-48.

The judgment is accordingly affirmed.

VANDERBILT, C. J. (dissenting). I differ from the majority in their construction of *R. S.* 19:23-45 as amended by *L.* 1952, *c.* 158, *p.* 526, which provides in part:

"A voter who has not voted in a primary election of a political party for two subsequent annual primary elections *shall not be permitted to vote* in any primary election of a political party until he has first *signed and filed* with the district board a *declaration* designating the political party in whose primary election he desires to vote." (Emphasis supplied)

Clearly this requirement of the statute is directed both to the prospective voter and the district election board. The words "shall not be permitted to vote" are obviously directed to the district election board; the provision with respect to signing and filing a declaration is manifestly aimed at the prospective voter. It is difficult to conceive of language more apt to express the legislative intent that the signing and filing of the declaration is a condition precedent to the right of the prospective voter to cast his vote at a primary election. I cannot escape the conclusion that compliance with the statutory provision was intended by the Legislature to be mandatory on both the prospective voter and the district election board and that failure to enforce it will subject the district election board and failure to comply with it will subject the voter to criminal prosecution. The provisions of the election law on this point are not only clear

but time honored. They stem from the statutes as far back as *L.* 1898, *c.* 139, and have been adjudicated and construed many times, notably in the cases of *Woodruff v. State,* 68 *N. J. L.* 89 (*Sup. Ct.* 1902); *State v. Nixon,* 86 *N. J. L.* 371 (*E. & A.* 1914); *State v. Caprio,* 98 *N. J. L.* 13 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.* 1923); *Petition of Clee,* 119 *N. J. L.* 310 (*Sup. Ct.* 1938); *State v. Tulenko,* 133 *N. J. L.* 385 (*E. & A.* 1945); *State v. Larison,* 134 *N. J. L.* 126 (*Sup. Ct.* 1946), affirmed 134 *N. J. L.* 604 (*E. & A.* 1946). The sanctions of the present election law are set forth in *R. S.* 19:34–48 which provides:

"Every person charged with the performance of any duty under the provisions of any law of this state relating to elections who willfully neglects or refuses to perform it, or who, in his official capacity, knowingly and fraudulently acts in contravention or violation of any of the provisions of such laws, shall be guilty of a misdemeanor."

and in *R. S.* 19:23–45 which further provides:

"Any person voting in the primary ballot-box of any political party in any primary election in contravention of the election law shall be guilty of a misdemeanor, and any person who aids or assists any such person in such violation by means of public proclamation or order, or by means of any public or private direction or suggestions, or by means of any help or assistance or cooperation, shall likewise be guilty of a misdemeanor."

There can be no doubt of the legislative intent to use the resources of the criminal law to enforce compliance with the provisions of the election law.

The language of the statute requiring the prospective voter who has not voted for two preceding primary elections to sign a declaration and file it with the board is clear and unambiguous. The provisions for a declaration which came into the statute first quoted in this opinion by *L.* 1952, *c.* 158, takes the place of the affidavit that had been required in our election law since the enactment of *section* 310 of *chapter* 187 of the *Laws of* 1930. Manifestly some kind of a document, whether it be an affidavit or a declaration, is necessary

if both the prospective voter and the members of the district election board are to be readily subjected to the penalty hereinbefore set forth and the public thereby protected from any wrongdoing on their part. See also *R. S.* 19:34–1, as further indicating a definite legislative intent to make every violation of the provision of the election law mandatory and an infraction thereof a criminal offense if done "willfully" or "knowingly." The object of the primary election law is to insure that the choice of the voters in each party should prevail and that anything done by the district election board or any member thereof or by any voter knowingly and willfully to distort the expression of the will of the members of either party as reflected in their ballots shall be a criminal offense and punishable accordingly.

In requiring a declaration instead of an affidavit the Legislature did not intend to have the provision for a declaration become a nullity, as it does under the construction of the statute accepted by the majority, for the danger to the sanctity of primary elections is too obvious and too great. If the statute required an affidavit as it formerly did instead of a declaration, no one would question the right of the Legislature to prescribe an affidavit. We see no more ground for the court questioning the Legislature's right to prescribe a declaration as the means whereby the prospective voter signifies his choice of a party in a solemn manner. It is for the Legislature to determine whether a simple declaration affords as effective a safeguard as an affidavit. Where it has determined that a declaration does furnish a sufficient safeguard, as it has here, we cannot avoid the conclusion that the signing and filing of such a declaration is as much a condition precedent to the right to vote as the taking of an affidavit formerly was.

The majority opinion proceeds on the ground that the statutory provisions for the permanent registration of the voter and the conduct of an election as set forth in *R. S.* 19:31–1 *et seq.; N. J. S. A.* 19:31A–7 and 8; *R. S.* 19:23–46 are a substitute for signing and filing the declaration as required by *R. S.* 19:23–45 as amended by *L.* 1952, *c.* 158,

here under discussion. The answer to this line of reasoning by the majority is simple; *L.* 1952, *c.* 158 is the latest expression of the legislative intent. If the Legislature had intended that the provisions of the permanent registration act and the comparing of signatures at the polls was to take the place of the earlier affidavit or the present declaration by the prospective voter it could easily have said so. We cannot assume that the Legislature was unmindful of the statutory provisions relied upon by the majority and that it enacted *L.* 1952, *c.* 158 inadvertently. Setting up the prerequisites for voting in a primary election are peculiarly within the province of the Legislature, whose duty it is to provide the essential safeguards to prevent a voter from jumping from party to party at successive primaries. The Legislature has wisely prescribed that a voter's indication of the party of his choice should not be left to a mere oral statement to be noted by a member of the district election board, but that it should be by the solemn written declaration of the voter himself duly filed with the election board.

The wisdom of this procedure is the more readily appreciated when we look at the practical consequences of the statute in action. If a voter should fraudulently vote contrary to the provisions of the statute in a political party in which he had no right to vote, he could always contend, if reliance was had in proceeding against him solely on the clerk's notation on the election board records, that the clerk had made a mistake in noting on such records what the voter had orally told him. On the other hand, such excuse would not be available where the voter has signed and filed the written declaration required by the statute. In short, under the construction of the statute by the majority flimsy defenses might well be asserted by a fraudulent voter, which would not be available to him in the face of his own signed declaration. The Legislature doubtless had this in mind in enacting *L.* 1952, *c.* 158. The other statutory requirements relied on by the majority are not a sufficient substitute for the signing and filing of the written declaration when one is confronted with actual fraud. While no fraud is alleged here, we are

bound to construe the act in such a way as to prevent fraud. The fact that the state has been quite free in recent years from scandals at the polls should not lull us into any false sense of security. If the safeguards set up by the Legislature are broken down there will be nothing to prevent the abuse of the right of suffrage. We were told at the oral argument that there are counties in the State in which not a single declaration had been filed at the recent primary election despite the fact that they were printed and distributed to the members of the district election boards. This is a matter which may well engage the attention of the law enforcement officers of the State. Prospective voters in the primary elections and members of the district election board should clearly understand that a voter by failing to sign and file a declaration in the circumstances where the statute requires it and the election board members by failing to require a declaration in such cases may render themselves subject to criminal prosecution.

While the election laws are not to be construed so as to render an election void for technical reasons, *Kilmurray v. Gilfert*, 10 *N. J.* 435 (1952) they must at the same time be interpreted and enforced so as to protect the sanctity of the ballot, which is the foundation on which popular government necessarily rests.

In this case in a statewide primary election the difference between the appellant's recorded vote and the respondent's is only 1,506. The disputed votes in Hudson and Warren counties alone numbered over 3,000, sufficient to turn the result of the election if the appellant's position is factually sound. In my view of the proper construction of the statute the present proceeding cannot be disposed of on a motion for summary judgment. There must be a complete investigation into the facts and on a statewide basis, if necessary.

I would reverse the judgment below.

*For affirmance*—Justices HEHER, OLIPHANT, WACHEN- FELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Chief Justice VANDERBILT—1.